FILED

JUN 23 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>MOHAMMED AHMAD,<br><br>    Defendant. | )   **I N F O R M A T I O N**<br>)<br>)<br>)<br>)   CASE NO. **1:25 CR 00301**<br>)   Title 18, United States Code,<br>)   Section 1035<br>)<br>)   **JUDGE FLEMING**<br>) |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

Relevant Individuals and Entities

1. Defendant MOHAMMED AHMAD resided in or around Avon, Ohio. Defendant has been licensed to practice medicine in Ohio since 2014.

2. Lifeline Recruiting, Inc., ("Lifeline") was a health care recruiting company headquartered in Boca Raton, Florida. Lifeline contracted with doctors and paid them on a "per consult" basis, purportedly to provide telemedicine services.

3. From on or about November 28, 2018, to on or about May 15, 2019, Defendant was employed by Lifeline as an independent contractor physician.

4. Lifeline purchased "leads" that included personally identifying information of Medicare beneficiaries and caused call centers to contact the beneficiaries to inquire about, among other information, the beneficiaries' Medicare eligibility, their health status, and whether they wanted Durable Medical Equipment ("DME") braces.

The Medicare Program

5. The Medicare Program ("Medicare") was a federal health care benefit program that provided items and services to individuals who were (a) age 65 or older, (b) had certain disabilities, or (c) had end-stage renal disease. Individuals who received Medicare benefits were called "beneficiaries."

6. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it was a public or private plan or contract, affecting commerce, under which any medical benefit, item, or service was provided to any individual, including any individual or entity who was providing a medical benefit, item, or service, for which payment may be made under the plan or contract.

7. The Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services, administered Medicare.

8. To receive Medicare reimbursement for benefits, items, or services performed on, or provided to, beneficiaries, practitioners had to apply for and execute a written provider agreement, known as a CMS Form 855.

9. Defendant became an approved Medicare provider on or about August 24, 2015. As part of his enrollment, Defendant certified that he agreed "to abide by the Medicare laws, regulations and program instructions" and acknowledged that "the Medicare laws, regulations, and program instructions are available through" the assigned Medicare contractor. Practitioners enrolled with Medicare had access to Medicare manuals, service bulletins, and local coverage determinations and policies describing Medicare coverage requirements for various services and items, including DME.

2

10. Defendant also certified that he "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." The Medicare enrollment application signed by Defendant set forth various criminal offenses related to participation in Medicare and the delivery of and payment for health care benefits, items, or services. Specifically, the Enrollment Application addressed Title 18, United States Code, Section 1035(a) which authorized criminal penalties against individuals:

> in any matter involving a health care benefit program who knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact; or makes any materially false, fictitious, or fraudulent statements or misrepresentations, or makes or uses any materially false[,] fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items or services.

11. Medicare was made up of several component "parts" that covered different items and services. Medicare Part B covered, among other items and services, outpatient care and supplies, including orthotic devices "braces," referred to as DME. Medicare Part B covered claims submitted for DME, including off-the-shelf knee braces, suspension sleeves, back braces, shoulder braces, ankle braces, and wrist braces, if the DME was medically reasonable and necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed medical practitioner.

### DME and Defendant's Fraudulent DME Prescriptions

12. Section 1847(a)(2) of the Social Security Act defined Off-The-Shelf ("OTS") orthotics as those orthotics described in Section 1861(s)(9) of the Act for which payment would otherwise be made under Section 1843(h) of the Act, which required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual. Orthotics that were paid for under Section 1834(h) of the

3

Act and were described in Section 1861(s)(9) of the Act were leg, arm, back, and neck braces. The Medicare Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130 provided the longstanding Medicare definition of "braces." Braces were defined as "rigid or semi-rigid devices which were used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body."

13. Under Medicare Part B, beneficiaries could only receive Medicare-covered DME braces from "suppliers" that were enrolled in Medicare.

14. DME supply companies submitted claims for payment of DME braces to Medicare Administrative Contractors ("MACs") for beneficiaries in Ohio. Pursuant to Medicare requirements, DME supply companies had to submit certain information relating to the beneficiary receiving the DME braces, including the following:

   a. the type of service provided, identified by a code from the Healthcare Common Procedure Coding System;

   b. the date of service or supply;

   c. the referring physician's National Provider Identifier ("NPI");

   d. the charge for the service;

   e. beneficiary's diagnosis;

   f. the NPI for the DME entity seeking reimbursement; and

   g. certification by the DME provider that the DME braces are medically necessary.

15. Further, before submitting a claim for a DME brace to a MAC, a DME supply company was required to have on file the following:

4

    a. written documentation of a verbal order or a preliminary written order from a treating physician or qualified medical practitioner;

    b. a detailed written order from the treating physician or qualified medical practitioner;

    c. information from the treating physician or qualified medical practitioner concerning the beneficiary's diagnosis;

    d. any information required for the use of specific modifiers;

    e. a beneficiary's written assignment of benefits; and

    f. proof of delivery of the DME brace to the beneficiary.

  16. Because orders for DME braces required, among other things, the signature of a licensed medical practitioner who was credentialed with Medicare in order to be reimbursed, Lifeline paid practitioners, including Defendant, to review and sign pre-completed orders for DME braces. Defendant was paid approximately $30 per review.

  17. Defendant signed and submitted orders for DME for beneficiaries without regard to medical necessity and often without reviewing the beneficiaries' medical records or speaking with the beneficiaries. In doing so, from in or around November 2018 to in or around May 2019, Defendant caused Medicare to be billed $267,401.77 for medically unnecessary braces, and caused Medicare to pay $126,643.35 to DME suppliers for medically unnecessary braces.

COUNT 1
(False Statement Relating to Health Care Matters, 18 U.S.C. § 1035)

The Acting United States Attorney charges:

  18. The factual allegations contained in paragraphs 1 through 17 of this Information are incorporated by reference as if stated fully herein.

19. On or about December 8, 2018, in the Northern District of Ohio, Eastern Division, Defendant MOHAMMED AHMAD, in a matter involving a health care benefit program, did knowingly and willfully make and use any materially false writing and document, knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items, and services, to wit: Defendant signed a medical examination note, letter of medical necessity, and orders for a back brace, two wrist braces, two knee braces, and two knee suspension sleeves for S.Y., a Medicare beneficiary, falsely indicating for each brace that Defendant "personally conducted an assessment" of the patient "for the prescribed treatment and device and verify[ing] that it is reasonably and medically necessary." Defendant also falsely documented in the medical records that he performed a pivot shift test on S.Y., an evaluation that must be performed by a physician in person with the patient. In fact, Defendant never saw S.Y. in person and never conducted an assessment of S.Y.'s condition or of whether DME braces were reasonable and medically necessary for S.Y. Rather, Defendant simply filled out pre-completed order forms provided by Lifeline, affixed his electronic signature, and submitted them to Lifeline for processing. As a result, Medicare reimbursed a DME supplier a total of $3,273.27 for the braces ordered for S.Y.

All in violation of Title 18, United States Code, Section 1035.

CAROL M. SKUTNIK
Acting United States Attorney

By: *(signature)*
Elliot Morrison
Chief, White Collar Crimes Unit